**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | |
|---|---|
| **ROSS BUNTROCK and MEDLEGAL LLP** <br><br>        **Plaintiffs,** <br><br> **v.** <br><br> **HARRY R. JACOBSON, M.D.;** <br> **RAY CAPP;** <br> **and MEDLOGIC LLC.** <br><br>        **Defendants.** | **Case No. _____** |

## COMPLAINT

Plaintiffs, Ross Buntrock and MedLegal, LLP ("MedLegal") (collectively, the "Plaintiffs"), by and through undersigned counsel, bring this Complaint against Defendants Harry R. Jacobson, M.D., Ray Capp, and MedLogic LLC ("MedLogic") (collectively, the "Defendants") and states as follows:

### I. INTRODUCTION AND SUMMARY

Ross Buntrock and MedLegal bring this case to seek redress for the Defendants' breaches of the parties' agreements and their related misrepresentations and fraud.

Mr. Buntrock went into business with Dr. Jacobson believing that he was pursuing a once-in-a-lifetime opportunity. Dr. Jacobson had a long and storied career in medicine and in business. At the time he met Mr. Buntrock, Dr. Jacobson was regarded as one of Nashville's most prominent figures in the medical business community. Starting in 2018, Dr. Jacobson leveraged that reputation – and representations regarding his alleged immense wealth and connections – to

convince Mr. Buntrock and others to invest in a series of new business ventures. Based upon Dr. Jacobson's representations and the promise of new opportunities, Mr. Buntrock winded down his successful legal practice in Washington, D.C., to come to Nashville. He quickly became involved in multiple business ventures that were owned and controlled, primarily, by Dr. Jacobson.

After some initial struggles, it appeared that things were moving in a positive direction, particularly with respect to two new business, MedLogic and MedLegal. Both were formed to leverage new technology and Dr. Jacobson's connections in the medical community to pursue claims in the world of mass torts. Mr. Buntrock and the individual Defendants held interests in both entities, and all three were made partners in MedLegal. However, behind the scenes and unbeknownst to Mr. Buntrock, Dr. Jacobson's financial empire was on the verge of collapse. Dr. Jacobson had taken on an enormous amount of debt from multiple sources that he could not repay. He and those working with him, including Ray Capp, began moving money around between entities to resolve what they referred to as short-term "cash flow" issues.

As his financial troubles continued to pile up, Dr. Jacobson eventually sought to leverage the assets of the fledgling mass tort-focused businesses to solve his debt problems. The plan was to obtain a significant loan using the mass tort cases being pursued by MedLegal as security. Mr. Buntrock agreed with the plan because he believed that the loan presented a reasonable solution to a short-term, solvable problem. He also believed that the funds would be put back into the new businesses, as required under the agreement with the lender, Bankwell Bank ("Bankwell"). He also believed that their interests were safe because Dr. Jacobson had to sign a financial disclosure, with Bankwell, affirming that he was still worth more than $125 million and that he had at least $10 million in liquid assets.

Dr. Jacobson's representations regarding his personal financial condition and his planned uses for the funds were false, and each the Defendants knew they were false at the time they were made. As soon as the $2 million loan was funded, Dr. Jacobson and Mr. Capp promptly took control of the funds and began distributing the money. They used all or nearly all funds to pay off debts and other expenses that had nothing to do with MedLogic or MedLegal. They did not disclose any of what they were doing to Mr. Buntrock until more than a year later, when Bankwell uncovered their misconduct. Bankwell sent notice that it would not renew the loan and promptly sued both businesses and the individuals who had guaranteed the loan, which included Mr. Buntrock, the individual Defendants, and Dr. Jacobson's son, Andrew Jacobson.

The Bankwell lawsuit put the parties and their businesses in an untenable position, and they needed an immediate solution. After many discussions and various attempts, they found another lender, Legalist, which would provide a new loan that they could use to pay off the Bankwell debt. The new loan was to be secured by the same assets – MedLegal's interests in the mass tort cases it was pursuing – but Legalist also required a personal performance guarantee from Mr. Buntrock because he was the only attorney amongst the partners of the firm.

Desperate to resolve the debt and avoid litigation that would fully expose their misconduct, the individual Defendants fraudulently induced Mr. Buntrock to agree to the Legalist proposal. In discussions with Mr. Buntrock, they agreed that that they would remain responsible for, and would reimburse Mr. Buntrock and MedLegal for, the amounts they had misappropriated from the Bankwell loan. They also assured Mr. Buntrock that they had the ability to quickly pay down the new loan. However, Defendants fraudulently concealed from Mr. Buntrock that the Bankwell debt was one of many that they could not pay. They were already facing other claims from other

3

lenders, which eventually resulted in further litigation. They did not disclose any of that information to Mr. Buntrock until many months later.

Defendants, and particularly Dr. Jacobson, fraudulently misled Mr. Buntrock and have now left him holding the bag. In violation of their agreement, Defendants have failed to pay back, or even pay down, the debt owed to Legalist (which, again, relates entirely to the funds they misappropriated from the Bankwell loan). The Legalist debt has ballooned from approximately $2 million to over $4 million—a debt for which Mr. Buntrock, as the only licensed attorney, remains personally and professionally responsible. Defendants have also failed to pay or reimburse Mr. Buntrock for amounts owed under his employment contracts, and for amounts that he loaned to Defendants' businesses. In addition to the referenced debts, Mr. Buntrock has sustained harm to his personal and professional reputation as a direct result of the Defendants' conduct.

Based upon all of the foregoing conduct, Mr. Buntrock and MedLegal bring this action alleging claims for breaches of the parties contracts, breach of implied contract, unjust enrichment, fraud, and misrepresentation. As grounds for his claims, Mr. Buntrock and MedLegal state as follows:

## II. THE PARTIES

1.      Plaintiff Ross Buntrock is a resident of Washington, D.C., and resides at 1821 Vernon Street N.W. Washington, D.C. 20009.

2.      Plaintiff MedLegal, LLP is District of Columbia Limited Liability Partnership.

3.      Defendant Harry R. Jacobson, M.D., is resident of the State of Tennessee, and resides at 822 Shadowstone Place, Nashville, Tennessee 37220-1827. As further discussed below, Dr. Jacobson is a prominent physician, executive, and entrepreneur who has held high-profile

positions in various businesses and nonprofit organizations in and outside of Nashville, Tennessee over a period of decades. Dr. Jacobson was the primary decisionmaker at MedLogic, Civotek, and Tutor Up.  Dr. Jacobson is a former partner of MedLegal.

4.     Defendant Ray Capp is a resident of the State of Tennessee, and resides at 9 Warwick Lane, Nashville, Tennessee 37205.  As further discussed below, Mr. Capp is a veteran technology and business executive with deep roots in Nashville's business community with extensive experience in the entertainment, technology, and healthcare sectors.  Mr. Capp is the CEO at MedLogic and was also the CEO at Tutor Up. Mr. Capp is a former partner of MedLegal.

## III. JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).   The amount in controversy exceeds $75,000.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the contracts at issue in this lawsuit were entered into in this district and because much of the tortious conduct that is at issue in this case occurred in this District.

## IV. FACTUAL BACKGROUND

A.     **Mr. Buntrock's Introduction to Dr. Jacobson and the End of iCitizen**

7.     Mr. Buntrock is a licensed attorney with over two decades of experience in technology law, data security, privacy, and complex litigation.

8.     Mr. Buntrock has spent his career at the intersection of law and technology, working for over three decades as a Silicon Valley technology, privacy, and data security attorney.

9.     Prior to the events giving rise to this Complaint, Mr. Buntrock operated Obsidian PLLC, a Washington, D.C.-based law firm focused on technology and intellectual property matters.  Mr. Buntrock developed a successful practice working with entrepreneurs seeking to build technology-driven ventures in regulated industries.

5

10.     In the summer of 2018, Mr. Buntrock was introduced to Dr. Jacobson through a mutual acquaintance who had previously served as the Chief Financial Officer of iCitizen, a startup company that Dr. Jacobson founded, and in which Dr. Jacobson had served as the lead investor. Dr. Jacobson had asked the referenced individual to return and take over the CEO position, but he had already taken another position elsewhere.   Their mutual acquaintance suggested to Dr. Jacobson that he speak with Mr. Buntrock about the opportunity.

11.     At that time, Dr. Jacobson had long been regarded as one of the most successful and influential people in medicine and in the Nashville business community.

12.     Dr. Jacobson's medical career began more than five decades ago.  Dr. Jacobson received his degree as a Doctor of Medicine from the University of Illinois Abraham Lincoln School of Medicine in 1972.  He trained in medicine at Johns Hopkins Hospital and completed his fellowship in nephrology at the University of Texas Southwestern, specializing in kidney failure and diseases.  He served as chief of the renal section at the US Army Surgical Research Center at Brooke Army Medical Center in San Antonio, Texas, before returning to the University of Texas Southwestern to work as a professor in internal medicine. In 1985, Dr. Jacobson moved to Nashville to join the medical faculty at Vanderbilt University Medical Center ("VUMC"), where he spent more than two decades.   After serving as a professor of medicine and director of the division of nephrology, Dr. Jacobson was eventually promoted to Vice Chancellor for Health Affairs and Chief Executive Officer of VUMC, a position he held until 2009.

13.     Under Dr. Jacobson's leadership, VUMC experienced unprecedented growth and success.  VUMC's revenues more than tripled and annual research funding quadrupled.  More than $1 billion was invested in developing new clinical and research facilities, including the Monroe Carell Jr. Children's Hospital, the Page-Campbell Heart Institute, the Ingram Cancer Center, the

Vanderbilt Comprehensive Diabetes Center, the Vanderbilt Brain Institute, the Bill Wilkerson Center for Otolaryngology and Communication Sciences, the Orthopedic Institute, and Vanderbilt Health at One Hundred Oaks. During that time period, VUMC rose in various national rankings for both hospitals and medical research institutions.

14.     Dr. Jacobson was also immensely successful in other business endeavors. He founded or co-founded several notable companies, including Contact Software (acquired by Symantec), Renal Care Group (acquired by Fresenius Medical Care), Cardiovascular Care Group, Informatics Corporation of America, CeloNova Biosciences (acquired by Boston Scientific), Ambulatory Services of America, MindCare Solutions, Innovative Renal Care, iCitizen, and ForBetterHealth. Renal Care Group was acquired by Fresenius Medical Care in 2005 for approximately $4 billion.

15.     Dr. Jacobson has served as a director of numerous businesses and nonprofits. Most notably, he served on the board of directors of three companies that are listed on the New York Stock Exchange: Renal Care Group, Merck & Co., and Kinetic Concepts. Dr. Jacobson also served on the board of directors of Ingram Industries from 2003 to 2020.

16.     After retiring from VUMC in 2009, Dr. Jacobson continued to have prominent roles in various businesses and other organizations. Among other endeavors, he served as chairman of MedCare Investment Funds until 2017, helping to facilitate investments totaling more than $600 million into a portfolio of 14 companies. Dr. Jacobson also launched an early-stage venture fund called TriStar Technology Ventures.

17.     Dr. Jacobson has received countless accolades and awards for his work in medicine and in business.

7

18.     It is against this backdrop of extraordinary achievement, institutional leadership, and entrepreneurial success that Dr. Jacobson approached Mr. Buntrock in 2018 with an opportunity to work together on civic technology ventures.

19.     Dr. Jacobson and Mr. Buntrock met at Dr. Jacobson's office in Nashville in June 2018, at which time Dr. Jacobson offered Mr. Buntrock the job of CEO of iCitizen with the plan to either pivot the company or shut it down.

20.     When the opportunity to work with Dr. Jacobson presented itself, Mr. Buntrock learned, through Dr. Jacobson and through his own research, about Dr. Jacobson's storied history and credentials and about his reputation both in Nashville and in the broader medical community. As Dr. Jacobson has done (and continues to do) with others, he leveraged his past successes to convince Mr. Buntrock to get on board. In particular, Dr. Jacobson highlighted his prior successful business ventures, his network of connections in the medical business community, and his many awards and accolades. Dr. Jacobson also made assurances to Mr. Buntrock regarding his financial condition and his ability to fund not just iCitizen, but other potential opportunities in which he would subsequently involve Mr. Buntrock.

21.     Based upon Dr. Jacobson's representations, Mr. Buntrock believed that Dr. Jacobson's proposal was a once-in-a-career opportunity. He agreed to effectively close his Washington, D.C. practice and move to Nashville to begin working at iCitizen for Dr. Jacobson.

22.     Unfortunately, as further discussed below, Dr. Jacobson's representations regarding his financial condition and his ability to fund his planned ventures were grossly inaccurate. In reality, Dr. Jacobson had already lost the bulk of the fortune he had amassed and was attempting to rebuild his wealth and personal standing through the new ventures.

23.     Mr. Buntrock moved to Nashville in October 2018, where he began working with Nirant Gupta, another former iCitizen employee, towards evaluating and, if possible, improving iCitizen's financial condition and business prospects.

24.     Mr. Buntrock and Mr. Gupta quickly determined that the company's capitalization table and balance sheet were too problematic to remediate.  Dr. Jacobson agreed and determined that the best course of action would be to have Mr. Buntrock wind down the company.  In what later became a trend, when the company shuttered, it left contractors, vendors, and others with a multitude of unpaid debts and other unfulfilled obligations.

**B.     Civotek Corp./Generous and the First Unfulfilled Promises**

25.     Before they completed the process of winding down iCitizen, Dr. Jacobson assured Mr. Buntrock that other opportunities would follow.

26.     The first opportunity came in December 2018 with a new company that Dr. Jacobson and Mr. Buntrock founded together called Civotek Corp., which did business under the moniker Generous (hereinafter, "Civotek").  At the time it was founded, Mr. Buntrock agreed to accept a below-market salary and an 8% equity stake in the company.

27.     Dr. Jacobson and Mr. Buntrock recruited a former iCitizen employee to serve as Chief Technology Officer, hired Mr. Gupta as head of product, and retained several engineers.  At the peak of its operation, the company had ten employees.  Together, they set out to build an online donations platform that would facilitate donations by users at any time and at any location.  They also set up a donor-advised fund called Generous Charitable, Inc. ("GCI")

28.     The Civotek business model was straightforward.  The company earned revenue by charging an optional platform fee on each donation. Those funds were received into the GCI (nonprofit) bank account, and GCI distributed the proceeds from the donor-advised fund to the

intended nonprofits. When making distributions to nonprofits, the team would market Civotek's technology to those same nonprofits, offering to expand their online presence and grow their donation base.

29. Despite some initial success following its launch, Civotek began experiencing financial difficulties less than a year after it was founded. Dr. Jacobson, who was funding the company from his own portfolio, advised Mr. Buntrock that he would no longer be paying anything except salaries for a period of time. He assured Mr. Buntrock that there was no reason to be concerned, and that it was only temporary cash flow issue.

30. Based upon Dr. Jacobson's assurances regarding his financial condition, both at that time and over the subsequent months, Mr. Buntrock agreed to pitch in and started paying Civotek's expenses out of his own pocket. Mr. Buntrock paid approximately $27,000 towards office rent and other business expenses on behalf of Civotek. In what also became a trend, Mr. Buntrock was never reimbursed for those expenses.

**C.    The Expansion: MedLogic, MedLegal, and the Promise of Growth**

31. In the spring of 2019, Dr. Jacobson brought on another accomplished business executive, Ray Capp, to serve at the CEO of another of his portfolio companies, Tutor Up Today. Mr. Capp was a veteran executive with deep roots in Nashville's business community. He had decades of experience in healthcare, education technology, entertainment technology, publishing, and distribution. Mr. Capp had served as the founding Chief Operating Officer of Ingram Entertainment, a subsidiary of Ingram Industries, and later served as President of Ingram Merchandising Services. He also ran ConduIT, a Vanderbilt University startup focused on technology solutions. In 2008, He became president and CEO of Nashville Technology Council, a not-for-profit association of information technology companies in Nashville. In that capacity,

10

Mr. Capp was also as a member of the Nashville Capital Network and served on that organization's board of directors and executive committee.

32.     Mr. Capp introduced Dr. Jacobson and Mr. Buntrock to the business concept that would become MedLogic and MedLegal—the ventures at the heart of this dispute. The goal was to leverage what appeared to be a promising technology-based venture in the mass tort legal services space.

33.     Around the time that he was introduced to Mr. Buntrock, Mr. Capp was working with a group led by Sean Harrison, who had worked with Ray Capp and Dr. Jacobson at the aforementioned Vanderbilt start-up, ConduIT. The group was planning to form a mass tort law firm in Washington, D.C., and then utilize insurance payer data to find mass tort claimants. Because Mr. Buntrock was licensed to practice in Washington, D.C., he told Mr. Capp that he believed he might be able to assist with that endeavor.

34.     Mr. Buntrock subsequently met with Mr. Harrison and Mr. Capp regarding the new business venture. Mr. Harrison, Mr. Capp, and Mr. Buntrock then presented the idea to Dr. Jacobson, who agreed to support the venture and participate in developing it.

35.     First, the group decided to form a new entity through which they would begin marketing using the new technology. Later, they decided to utilize a separate legal entity that was to be affiliated with the marketing entity.

36.     Ownership of MedLogic was split among Dr. Jacobson, Ray Capp, Mr. Buntrock, and Andrew Jacobson. For the law firm, MedLegal, Mr. Buntrock held 60%, Dr. Jacobson and Ray Capp each held 23%, and Andrew Jacobson held the remainder. Mr. Harrison and his team ultimately decided to part ways with the company following a disagreement relating to the proposed ownership structure, and did not receive any ownership interest in the company.

11

37.     In November 2019, they caused MedLogic, LLC to be formed in Tennessee.

38.     Mr. Buntrock subsequently arranged for his single-member law firm, Obsidian PLLC, to be converted into a partnership, which was then rebranded as MedLegal.  After ensuring that their proposed ownership structure and partnership agreement complied with applicable law, Dr. Jacobson, Ray Capp, and Andrew Jacobson became non-attorney partners in the firm, along with Mr. Buntrock, who remained the only partner who was a licensed attorney, as permitted by the District of Columbia Rules of Professional Conduct.

39.     Shortly after MedLogic was formed, Dr. Jacobson suggested a change in approach: rather than attempting to utilize insurance company data to find claimants, they would form relationships with physician practice groups.

40.     The business plan for MedLogic and MedLegal required significant capital to execute.  The companies needed to: (1) develop and refine the technology platform; (2) hire staff including data scientists, medical professionals, legal support staff, and business development personnel; (3) establish relationships with healthcare providers and payers; (4) market to and acquire potential clients; and (5) manage the substantial costs of prosecuting mass tort cases (including medical record acquisition, expert witness fees, and litigation expenses).

41.     Dr. Jacobson assured his partners that he was committed and that he had the financial resources to adequately capitalize these ventures. His track record of building companies, his service on the boards of public companies, and his representations regarding his wealth and business acumen gave his partners every reason to trust these assurances.

42.     The initial returns were very positive.  Utilizing one of his personal connections, Dr. Jacobson was quickly able to facilitate an agreement with major medical practice based in Nashville, Tennessee, which resulted in an agreement between that entity and MedLogic.  Under

12

that agreement, the two entities were to work together to find eligible mass tort claimants among the patient population of the various offices operated by the medical practice. The resulting agreement validated the business model and provided a clear path forward for both MedLogic and MedLegal. By the fall of 2020, MedLogic started receiving its first referrals from the medical practice.

43. For his part, Mr. Buntrock went "all in." In 2019 and 2020, Mr. Buntrock devoted substantial time to developing a mass tort practice and to improving his personal knowledge and experience in that area of the law. In addition to the time he spent developing MedLogic and MedLegal, Mr. Buntrock also continued to fulfill his duties as CEO of Civotek.

44. However, from the start, the businesses were plagued by gross mismanagement by Dr. Jacobson and Mr. Capp. In addition, Dr. Jacobson and Mr. Capp misappropriated the assets of the businesses and used them as personal piggy banks. They routinely diverted capital that was supposed to be used to grow the businesses for unrelated other purposes. In most instances, the misappropriated funds were used to pay down preexisting debts owed by Dr. Jacobson relating to other failed business ventures, or to temporarily solve liquidity problems at other businesses that relied upon Dr. Jacobson for funding. In some instances, Mr. Capp misappropriated funds for his own personal use.

**D.    Dr. Jacobson's Financial Distress and the Resulting Loans**

45. Underneath the surface, and unbeknownst to Mr. Buntrock, Dr. Jacobson was already encountering significant financial troubles by early 2020, which continued and multiplied over the following years.

46. Dr. Jacobson enlisted help from Mr. Buntrock and others in multiple endeavors that were intended to fix what he would regularly refer to as "short term" or "cash flow" issues.

13

47.     For example, Dr. Jacobson asked Mr. Buntrock to serve as the trustee of a trust that he had previously set up for one of his sons.  Dr. Jacobson later found a way to liquidate the trust.

48.     In the spring of 2020, in the early months of the pandemic, around the time when the PPP programs were announced, Dr. Jacobson instructed his partners to apply for any and all government funding from any of the SBA programs that existed to help the businesses weather the pandemic.  Civotek received two tranches of PPP funding, which were ultimately forgiven, totaling approximately $375,000.  Dr. Jacobson directed that the funds be sent to him to reimburse him for payroll expenses he claimed to have incurred on behalf of the company, which was done.

49.     By early 2021, it became clear that MedLogic and MedLegal needed substantial additional capital that Dr. Jacobson could not provide in order to execute their business plans. The companies were hiring staff, developing technology, and establishing relationships with healthcare providers.  In addition, the firm had started to receive referrals for potential clients with mass tort claims and was in a position to start pursuing actions on their behalf.  All of that work required capital.

50.     In the spring of 2021, Dr. Jacobson suggested to his partners that they explore how they might be able to leverage their client inventory and obtain additional funding or financing. They were eventually introduced to Bankwell, a regional bank headquartered in New Canaan, Connecticut.  On June 1, 2021, Ross Buntrock, Harry Jacobson, Ray Capp, and Andrew Jacobson, on behalf of MedLogic and MedLegal, closed on a deal with Bankwell for a $2 million line of credit.

51.     The Bankwell loan was taken out in the names of MedLogic, MedLegal, and the four individual principals. All four partners signed the loan documents, becoming jointly and severally liable for the debt.

52.    Critically, because of the size of the loan and the fact that the businesses were relatively new, Bankwell required Dr. Jacobson to provide a personal guarantee that included additional assurances.  In other words, Bankwell, a sophisticated commercial lender, needed assurance that if the ventures failed, Dr. Jacobson had the personal resources to make the bank whole.  As part of his guarantee, Dr. Jacobson provided Bankwell with a Personal Financial Statement and agreed to loan covenants that required him to maintain a personal net worth of at least $125million with at least $10 million in liquid assets.

53.    Bankwell was not the only party to the transaction that relied upon Dr. Jacobson's assurances that he had the resources to cover the debt if the businesses failed.  Mr. Buntrock also relied upon the same assurances from Dr. Jacobson regarding his financial condition and net worth, because they were entirely consistent with the information that Dr. Jacobson had provided to Mr. Buntrock since they had first met.  If Mr. Buntrock had known that Dr. Jacobson was in severe financial distress, he would not have agreed to become jointly and severally liable for a $2 million loan that was effectively backed and guaranteed by Dr. Jacobson.

54.    The stated purpose of the Bankwell loan was clear and specific: to provide working capital for MedLogic and MedLegal. Per the agreement with Bankwell, the funds were to be used to scale the businesses, including paying for staff salaries, technology development, case acquisition costs, medical record retrieval, expert witness fees, marketing, and other operating expenses directly related to building and operating these two companies.

55.    The loan proceeds of $2 million were disbursed to Dr. Jacobson in June 2021.

56.    Thereafter, Dr. Jacobson and Mr. Capp managed the funds from the loans and controlled the draws of funds until, as further discussed below, Bankwell demanded that the loan be repaid.  They did so using accounts that were set up by Mr. Capp and Andrew Jacobson.  They

15

opened accounts for MedLogic and MedLegal with Bankwell, and then set up accounts at various other banks in Nashville in the names of those entities that Mr. Capp and Dr. Jacobson controlled.

57. For all of the same reasons that Mr. Buntrock chose to go into business with Dr. Jacobson in the first place, Mr. Buntrock trusted Dr. Jacobson to manage the funds in question. In addition to Dr. Jacobson's stature in and outside of their businesses and track record of success, Dr. Jacobson personally assured Mr. Buntrock that his financial situation was managed and that they were positioned for success. Mr. Buntrock was also comforted by the fact that Dr. Jacobson had personally guaranteed the line and provided what Dr. Jacobson represented to be his personal financial statement – reflecting a net worth of $125 million – in support of the loan.

58. However, rather than using the Bankwell loan proceeds for their intended and represented purpose—funding the operations of MedLogic and MedLegal—Dr. Jacobson and Mr. Capp systematically diverted the funds to pay for expenses unrelated to either MedLogic or MedLegal.

59. Mr. Buntrock later learned, after the harm had already occurred, that the Bankwell funds were used to fund payroll and other debts for other companies controlled by Dr. Jacobson, including Generous and Tutor Up Today, and to pay for other obligations of Dr. Jacobson and Mr. Capp that had nothing to do with MedLogic or MedLegal.

60. In the early summer of 2022, Mr. Capp informed Mr. Buntrock, after an in-person meeting, that Bankwell would not renew the line for another term. The apparent reason that Bankwell was refusing to renew the line of credit was that it had serious concerns regarding how the money was spent.

61. Several months later, in August 2022, Mr. Buntrock was informed that Bankwell had determined that Dr. Jacobson had used the loan proceeds almost entirely for non-

16

MedLogic/MedLegal purposes. A spreadsheet was prepared that demonstrated that Dr. Jacobson and Mr. Capp had wrongfully misappropriated and misused the funds from the loan, in violation of the agreement with Bankwell. In August 2022, Bankwell formally declined to renew the line of credit.

62. The consequences of the Defendants' misappropriations were immediate and severe. MedLogic and MedLegal, starved of the capital they needed to operate, began to experience cash flow crises. Staff were not being paid on time. Operating expenses went unpaid. The businesses that had shown significant promise quickly began to deteriorate.

**E.      Additional Misappropriations and Financial Desperation**

63. The Defendants' handling of the Bankwell loan funds was not an isolated incident. It was part of a pattern of financial mismanagement and misappropriation that would devastate the businesses and betray the trust of Dr. Jacobson's partners.

64. In December 2021, MedLegal received its first significant settlement funds: $192,000 for its portion of a mass tort settlement. Those funds represented fee income earned by the partnership for legal work performed on behalf of clients in the litigation.

65. Under the Partnership Agreement, these settlement funds were partnership assets to be distributed according to the agreed-upon profit-sharing formula. The funds were needed to pay partnership expenses, cover costs, compensate staff, and provide distributions to the partners. However, Dr. Jacobson instead demanded that settlement funds be remitted directly to him personally.

66. Mr. Buntrock strenuously objected, but ultimately gave in to Dr. Jacobson's demand, because Mr. Buntrock and the businesses were fully dependent upon Dr. Jacobson's participation and backing. Mr. Buntrock prepared a promissory note documenting that these funds

were being taken by Dr. Jacobson and obligating Dr. Jacobson to repay them, which Dr. Jacobson signed.

67. Dr. Jacobson took the settlement funds for his personal use. Further, Dr. Jacobson never repaid the $192,000.

68. With the benefit of hindsight, Mr. Buntrock now understands that by August 2022, when Bankwell refused to renew the line of credit, Dr. Jacobson's financial constraints had become far more severe and more urgent. Multiple entities in which Dr. Jacobson held an ownership – and which relied upon Dr. Jacobson's financial backing – were struggling financially, all at once. As a result, the companies were consistently in danger of missing their payment obligations, including payroll.

69. In multiple instances, the companies were late in making payroll, which led to problems with Insperity Holdings Inc., the professional employment organization that provided payroll services for MedLogic and MedLegal (and other companies in which Dr. Jacobson was an owner), through a management company known as Ava Management, Inc., which was owned by and operated at the direction of Dr. Jacobson.

70. In August 2022, based upon the situation with Bankwell and because he was concerned that he might not be able to pay his employees, Dr. Jacobson began exploring whether he could "borrow" money from GCI, the nonprofit donor-advised fund associated with Civotek. Mr. Buntrock again vehemently objected, and told Dr. Jacobson in no uncertain terms that he did not think that such a transaction would be appropriate or legally permissible. However, over Mr. Buntrock's objection, and based upon advice that Dr. Jacobson had received from an outside attorney, Dr. Jacobson proceeded with the transaction. The outside attorney drafted a promissory note between Ava Management, Inc. and GCI, which Dr. Jacobson signed.

18

71.     Dr. Jacobson ultimately borrowed $65,000 from the donor-advised fund. He promised that he would "replace the funds in a few days." The funds were used to pay diligence fees and help pay part of payroll.

72.     As with the prior loans, however, Dr. Jacobson failed to repay the funds. Instead, less than two weeks later, Dr. Jacobson called Mr. Buntrock and asked him to facilitate another "loan" from GCI. Mr. Buntrock firmly declined to facilitate the additional transaction and, in that instance, was able to stop it from occurring.

73.     Dr. Jacobson never repaid this $65,000 borrowed from GCI.

**F.      The Bankwell Litigation and the Search for Rescue Financing**

74.     On September 9, 2022, the inevitable occurred: Bankwell Bank filed a lawsuit against MedLogic LLC, MedLegal, Ross Buntrock, Harry Jacobson, Ray Capp, and Andrew Jacobson in the United States District Court for the District of Connecticut, declaring the $2 million note in default and seeking full repayment plus interest, attorneys' fees, and costs.

75.     The complaint filed by Bankwell was devastating in multiple respects. It exposed the misuse of the loan proceeds and threatened the credit and professional reputations of all the partners (particularly Mr. Buntrock, the only licensed attorney in the group). The lawsuit also created an immediate crisis: the businesses could not operate under the cloud of federal litigation by their primary lender. The partners had no choice but to find a way to pay off the Bankwell debt as soon as possible.

76.     What happened next was nothing short of a frantic scramble to find funding to pay the obligations and end the litigation.

77. Adding to the businesses' growing struggles, in September 2022, Insperity Holdings Inc., terminated its contract with Ava Management, Inc. because Dr. Jacobson had been chronically late in funding payroll.

78. As a result of that termination, Mr. Buntrock, along with other employees who had money set aside in health savings accounts, lost those funds. Employees also lost their traditional healthcare coverage and were forced to buy COBRA coverage.

79. On October 9, 2022, Dr. Jacobson informed Mr. Buntrock that he was "in danger of defaulting on his home mortgages." Less than two years earlier, he had represented to Bankwell Bank – and by extension to his partners – that he had a net worth of at least $125 million with $10 million in liquid assets. However, there had not been any event during the intervening time period that had wiped away Dr. Jacobson's immense wealth. Dr. Jacobson had not been honest with his partners, employees, or lenders.

80. During the fall of 2022, the partners worked desperately to find a solution to the Bankwell default. Dr. Jacobson implored Mr. Buntrock to seek financing from his cousin and mentor, which Mr. Buntrock did. However, once his cousin's family office reviewed the financials of MedLogic and MedLegal which had been created by Dr. Jacobson, Mr. Capp, and Andrew Jacobson, Mr. Buntrock's cousin declined to proceed with providing any financing, for the same reasons that Bankwell declined to renew the line: the mismanagement and comingling of funds among entities and Dr. Jacobson's personal accounts.

81. Thereafter, the partners explored multiple options. For example, Andrew Jacobson met with a group called Winhall Management that had come from New York but was operating in Nashville. However, Winhall provided a term sheet that required that each of the four principals, including Mr. Buntrock, to provide a personal guarantee for the obligation. Mr. Buntrock refused

20

to sign a personal guarantee on the debt – even with assurances from Dr. Jacobson that he would guarantee Mr. Buntrock's guarantee.

82.     Mr. Buntrock did not believe that he could rely upon Dr. Jacobson's assurances and resources as security.  Mr. Buntrock told Dr. Jacobson that if he was in a position to guarantee his guarantee, they would not have needed the financing to begin with.  Ignoring Mr. Buntrock's objections, Dr. Jacobson insisted that they had to keep all avenues open and signed the Winhall term sheet. The term sheet required a $30,000 diligence fee.  As discussed below, the partners ultimately agreed to go in a different direction.

**G.     The Legalist Loan**

83.     Mr. Buntrock was introduced to a broker in the legal finance world, Wellworth Capital, who set about helping the four partners to try to find a lender who would provide financing based on the law firm's portfolio of mass tort cases, which had significant settlement value. Wellworth Capital specialized in finding litigation funders—financial firms that provide loans secured by the value of pending legal cases.  Working with Wellworth, the partners identified Legalist, a litigation funding company based in San Francisco, California, as a potential source of rescue financing.

84.     Legalist ultimately offered MedLegal a $5 million line of credit.  However, the non-recourse financing provided by Legalist was extremely expensive, with a nearly $500,000 annual fee along with an interest rate of 27% plus prime rate.

85.     The Legalist proposal also came with a significant personal obligation for Ross Buntrock: as the only licensed attorney in the partnership, Mr. Buntrock was required to provide a personal performance guarantee to Legalist. He would have to guarantee to Legalist that he would

personally prosecute the cases in the MedLegal portfolio to completion and payment. The personal guarantee would survive Mr. Buntrock's death.

86.     That condition was highly problematic on its face for Mr. Buntrock, particularly given that the Bankwell funds had been misappropriated by the Defendants and used to pay off debts and expenses that had not benefited MedLogic and MedLegal.  However, despite the recent revelations regarding the Defendants' gross misuse of the funds from the Bankwell loan and the existence of other unpaid debts, Mr. Buntrock still believed that there was potentially a path forward towards profitability for all of the businesses and individuals involved.  Mr. Buntrock also believed that the only way for him and the Defendants to extricate themselves from the lawsuit and the debt was to obtain the new loan. Dr. Jacobson also insisted that the new Legalist financing was the only path forward.

87.     The partners, including all three of the Defendants, each agreed to the Legalist loan and to the referenced conditions for several reasons.  First and foremost, they needed to find a way to resolve the Bankwell lawsuit, and paying off the debt would facilitate a resolution that regard. The end of the lawsuit and paying off the Bankwell note would inure to the benefit of all of the business entities and individuals – including all of the Defendants – who guaranteed the note and who were named as defendants in the lawsuit. If the Bankwell default went uncured, Bankwell would have been able to encumber each and every asset of MeLegal and MedLogic, which had a portfolio that was estimated at that time to be worth millions. The debt payoff would also enable the businesses to continue operating and allow the partners, including the Defendants, to collect the value of the case portfolio.  During the time of the negotiations with Legalist, Dr. Jacobson's refrain to Mr. Buntrock and the others was that once the Bankwell litigation was resolved, he

would lead the efforts to engage new medical practices as he had previously, and they would quickly add new cases to the portfolio to earn and grow their way out of the Legalist debt.

88.     All of the partners, including Dr. Jacobson, Mr. Capp, Mr. Buntrock, and Mr. Jacobson, participated in the negotiations and related discussions with Legalist.  Each of them had personal knowledge of and approved the terms of the Legalist proposal. When Mr. Buntrock expressed his concerns about the onerous terms of the proposed Legalist financing, Dr. Jacobson assured him that in his many years of growing companies, the Legalist terms were not unusual, and in fact were routine, if not standard.  Dr. Jacobson also assured Mr. Buntrock that the Legalist facility would be a temporary solution, because Dr. Jacobson, through his network and outreach efforts, would rapidly expand the case portfolio to pay down the debt.

89.     All four partners agreed to use the MedLegal's portfolio of cases to secure the loan through Legalist, in order to pay off the Bankwell debt.

90.     Each of the Defendants understood and agreed that MedLegal's assumption of the Bankwell debt would benefit them, personally, because it would enable them to resolve the Bankwell debt and the related lawsuit.  Further, throughout the relevant time period and continuing through the present, the Defendants expressly acknowledged and admitted that the funds from Bankwell had not been used in the manner contemplated when they signed the loan, nor had the repayment terms of the Bankwell note been met.  Dr. Jacobson and Mr. Capp, in particular, have repeatedly admitted to Mr. Buntrock that they took the money and used it for other purposes, and that they were personally responsible for repaying it.

91.     For all of those reasons, each of the Defendants understood and expressly agreed with Mr. Buntrock, in an agreement that was separate and apart from the agreement with Legalist, that all four partners would be responsible and liable the "new" debt with Legalist.  Dr. Jacobson

23

and Mr. Capp also agreed that they remained responsible for repaying the funds that they had misappropriated from the Bankwell loan. In short, the Defendants each expressly agreed that Mr. Buntrock would not be left "holding the bag" simply because he was the only attorney in the group and, therefore, the only one who was being required to provide a performance guarantee.

92. Based upon the referenced agreement with and assurances from the Defendants, and his belief that they had no other choice if they wanted to keep the businesses afloat, Mr. Buntrock acquiesced and agreed to sign off on the Legalist line of credit, and agreed that the funds would be used to pay off the Bankwell debt. Mr. Buntrock agreed to that arrangement based upon his belief that he was working with trustworthy partners who would, in good faith, fulfill their obligations to the businesses. Mr. Buntrock also agreed to the Legalist proposal based upon the Defendants' express agreements that they would be personally responsible for and obligated to repay, to MedLegal, the funds that were to be paid towards the additional debts not associated with the Bankwell loan.

93. The Defendants' agreement with Mr. Buntrock regarding their personal obligations and liability for the debt became a binding contract upon Mr. Buntrock's acceptance and agreement to sign the Legalist guarantee.

94. Legalist facility provided the first tranche of funds to pay off the Bankwell note directly. To that end, Legalist wired the funds directly to Bankwell, which extinguished the litigation and allowed the firm to keep all of its assets and its case inventory. The Legalist deal also allowed Dr. Jacobson to avoid having to make good on his personal guarantee of the Bankwell note.

95. At the time the Legalist loan closed, the Bankwell obligation was approximately $2.25 million including principal, interest, and fees.

24

96. There was approximately $45,000 of money left over from the Legalist funding that was not required to pay Bankwell. Dr. Jacobson used those funds to pay payroll and other expenses unrelated to the law firm's legitimate business purposes.

97. Wellworth Capital, the broker that identified Legalist and shepherded the transaction to closing, was owed a $90,000 broker's fee per the terms of its engagement. Dr. Jacobson promised to pay this fee but never did. To this day, Wellworth remains unpaid for its services—services that directly benefited Dr. Jacobson by extricating him from the Bankwell litigation. Additionally, a $10,000 consulting fee is owed to a litigation consultant who assisted in underwriting the loan.

## H. The Pfeffer Litigation and the Defendants' Concealment

98. In December 2022, Mr. Buntrock discovered a demand letter sent on behalf of Phil Pfeffer regarding a $500,000 loan that Mr. Pfeffer had apparently made to MedLogic.

99. Mr. Buntrock had not been told about the loan, even though he owned 23% of MedLogic. He had also not been told that Dr. Jacobson had failed to comply with the terms of the financing that he obtained from Mr. Pfeffer.

100. Mr. Buntrock immediately inquired of Dr. Jacobson and Ray Capp about the status of this obligation and the terms of the loan.

101. Dr. Jacobson and Mr. Capp assured Mr. Buntrock that "the matter [was] being handled" and that there was nothing for him to worry about. They both repeated those assurances each time Mr. Buntrock asked about the debt and the status of their negotiations with Mr. Pfeffer.

102. Mr. Buntrock subsequently learned that his partners had deliberately concealed from him that in March 2023, Mr. Pfeffer had filed a lawsuit against MedLogic and Dr. Jacobson for defaulting on the $500,000 loan. Dr. Jacobson, Mr. Capp, and Mr. Jacobson were all aware of

this lawsuit. They received pleadings, they engaged in the litigation, and they made decisions about how to respond to the claims. They told Mr. Buntrock nothing.

103. The Defendants' concealment was deliberate. They knew that if Mr. Buntrock learned that MedLogic was being sued for defaulting on yet another loan—a loan Mr. Buntrock had never been told about – he would have demanded a full accounting of the company's finances and would have taken further measures to try to protect himself.

104. The concealment continued for approximately five months, from March 2023 through late July 2023. In the interim, as discussed below, the problems for Dr. Jacobson and Mr. Capp continued to multiply.

## I. Missed Payrolls and Forced Separation

105. In fall of 2021, Mr. Capp had thought it would be a good idea for all the companies that Dr. Jacobson was funding out of his personal portfolio to have a shared services agreement with a new management company. The idea was that it would be more efficient for a single management company to provide payroll and benefits rather than having three separate companies handling that work. That idea led to the formation of Ava Management, Inc.

106. Ava Management, Inc., took over the contract from Civotek with Insperity PEO. However, as described, Insperity later terminated the contract with Ava Management in September 2022 based upon Dr. Jacobson's repeated failures to timely fund payroll.

107. Over time, the late payroll funding became increasingly worse, leading to delays in paying the companies' employees.

108. On April 15, 2023, for the first time, Ava Management, Inc., completely failed to make payroll for MedLogic and MedLegal staff. Employees who depended on their paychecks to pay rent, mortgages, car payments, and living expenses received nothing.

109.    Dr. Jacobson apologized to his partners and employees and assured everyone that this was a temporary cash flow issue that would be resolved.  However, Dr. Jacobson was never able to solve the problem.

110.    By June 10, 2023, Ava Management, Inc., was four payrolls behind, and employees had not been paid in a month. The company owed tens of thousands of dollars in unpaid wages to employees who had continued working in good faith, believing Dr. Jacobson's promises that a "forthcoming liquidity event" what he had portrayed as a temporary cash shortage.

111.    Dr. Jacobson continued to urge staff to remain and keep working, promising that payment would come. For months, he, Mr. Capp, and Mr. Jacobson continued to assure their employees that they would be paid.

112.    During the period of time when payrolls had been late, Mr. Jacobson offered to provide people loans from his personal funds. The resulting payments were categorized as loan advances.

113.    By July 2023, Mr. Buntrock had encouraged Dr. Jacobson to begin terminating employees rather than continuing to make what he believed were false assurances.  However, Dr. Jacobson did not have sufficient funds to cover the employees' paychecks. So, rather than terminating their employment, Dr. Jacobson continued to string them along.

114.    Most staff resigned by August 2023, unable to continue working without compensation.

115.    In the spring of 2023, MedLegal received another settlement payment in the amount of $50,000. Mr. Buntrock immediately used $45,000 of that amount to repay GCI, because Dr. Jacobson had still not repaid the $65,000 he had "borrowed."  Mr. Buntrock again demanded that Dr. Jacobson repay the remaining balance, and that he also disclose to the other two board members

27

of GCI that he had borrowed the money.  However, Dr. Jacobson and Mr. Capp both refused.  For his part, Dr. Jacobson responded: "let's not break into the jailhouse."

116.    On August 3, 2023, Mr. Buntrock finally learned about the lawsuit by Mr. Pfeffer against MedLogic.

117.    That revelation was the final straw. Over a period of years, his partners had misrepresented their financial conditions; deliberately conceal material litigation; misappropriated partnership funds; failed to pay employees; and systematically breached their fiduciary duties. Throughout that period, they had relied upon and taken advantage of Mr. Buntrock, who was serving as the attorney of record and a guarantor for a growing mountain of debt.

118.    At an in-person meeting in Nashville, Tennessee on August 3, 2023, Mr. Buntrock contacted counsel Jack Stringham, who joined a phone call with Dr. Jacobson, Mr. Capp, and Andrew Jacobson.   Thereafter, Mr. Buntrock demanded the immediate resignation of Dr. Jacobson, Mr. Capp, and Mr. Jacobson from the MedLegal partnership.

119.    All three Defendants complied and resigned from the law firm that same day.  The resignation letters from Dr. Jacobson, Mr. Capp, and Andrew Jacobson acknowledged their separation from MedLegal.

120.    Mr. Buntrock also resigned from MedLogic that same day, severing his relationship with the company in which he had owned a 23% interest, because the Defendants had deliberately withheld devastating information regarding their misuse of company funds, taken out additional loans without his consent or knowledge, and had excluded him from discussions surrounding the running of the business.

**J.      The Mounting Debt and Present Crisis**

28

121.    Over the following months, the Defendants' financial condition and that of the companies they were operating continued to grow more dire.

122.    Most employees finally quit working.   However, Mr. Buntrock and another colleague continued to fulfill their obligations to MedLogic and MedLegal in order to preserve the assets of those entities and in furtherance of Mr. Buntrock's commitment to pursue the best results possible in the mass tort cases.

123.    The Legalist facility's balance has ballooned from the approximately $2.25 million needed to pay off Bankwell in December 2022 to over $4 million, and it continues to grow with interest and fees at the approximately $500,000 per year.

124.    Mr. Buntrock, as the  sole partner in MedLegal and as the provider of the personal performance guarantee to Legalist, remains personally obligated for this debt.

125.    Meanwhile, Dr. Jacobson, Ray Capp, and Andrew Jacobson—who benefited directly from the Legalist loan paying off the Bankwell debt; who participated in and approved the transaction with Legalist; and who expressly agreed that they remained liable to Mr. Buntrock and to MedLegal for the amounts owed—have failed and refused to contribute to repaying this obligation.

126.    The debt grows daily, so the liability grows daily. Mr. Buntrock's professional reputation and his financial future are increasingly at risk because he trusted the Defendants and relied on representations that proved to be false.

## V. CAUSES OF ACTION

### COUNT I:
### BREACH OF CONTRACT – ALL DEFENDANTS
### Verbal Contract Relating to the Legalist Funding

127. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

128. In December 2022, prior to signing the closing documents of for the line of credit with Legalist, the Defendants entered into a verbal contract with Mr. Buntrock regarding the funds at issue and their personal responsibilities and liabilities relating to the loan.

129. At the time, the Defendants and businesses in which they held significant ownership interests were named parties in the lawsuit filed by Bankwell.

130. Defendants were personally responsible and liable for every dollar of the underlying debt owed to Bankwell, because they had misappropriated and used the funds for purposes unrelated to the business of MedLegal and MedLogic, as required under the agreement with Bankwell.

131. The Defendants and Mr. Buntrock determined that their only viable option for repaying the debt owed to Bankwell was to leverage the assets of MedLegal. This was necessitated by the fact that Dr. Jacobson's other assets and income streams were highly leveraged as a result of other debts.

132. The Defendants stood to personally benefit from a loan through Legalist, because paying off the debt would facilitate a resolution of the lawsuit and would buy needed time to pay off the underlying debts that were at issue. Thus, the Legalist line of credit would both get the Defendants out of the lawsuit and eliminate the personal guarantees they had signed on the Bankwell note. The debt payoff would also enable them to continue operating the businesses.

133. Further, the payoff of the Bankwell loan would absolve the Defendants of their gross misconduct and wrongdoing in their handling of the loan funds from Bankwell. As described, the Defendants did not use the loans for their intended purposes, as required under the

30

contract with Bankwell. Instead, they used the funds to pay off unrelated debts and for other clearly impermissible purposes. Defendants have expressly acknowledged and admitted that the funds from Bankwell had not been used in the manner contemplated when they signed the loan.

134. Mr. Buntrock's participation in the agreement with Bankwell also stemmed from Dr. Jacobson's misrepresentations to Mr. Buntrock (and others, including Bankwell), regarding his financial condition, including his assurances regarding his net worth and liquidity. Neither Bankwell nor Mr. Buntrock would have agreed to the deal but for Dr. Jacobson's misrepresentations in that regard. Dr. Jacobson faced significant personal liability relating to those misrepresentations, which constituted fraud, both to Bankwell and to his partners (and is still liable for such misconduct, for the reasons described below).

135. For all of these reasons, the Defendants needed and desired for MedLegal and Mr. Buntrock to go forward with the deal with Legalist for the line of credit.

136. However, Mr. Buntrock, alone, was asked by Legalist to sign a performance guarantee, because he was the only partner who was a licensed attorney. Because they are not attorneys, the Defendants did not have the ability to pursue the lawsuits that served as the collateral for the line of credit.

137. In order to induce Mr. Buntrock to sign off on the Legalist line of credit and the personal performance guarantee, each of the Defendants expressly agreed, verbally, with Mr. Buntrock, that they would be responsible and liable the "new" debt with Legalist. Dr. Jacobson and Mr. Capp each further expressly agreed that they remained personally responsible and liable to Mr. Buntrock and to MedLegal for repaying the funds that they had taken from the Bankwell loan that they had used for other purposes. On numerous occasions throughout the Legalist negotiations and thereafter, Dr. Jacobson stated that the Defendants would "grow" their way out

of the debt by dramatically increasing the number of cases in the MedLegal portfolio, and that they would also diversify the portfolio with different types of cases.

138.   In short, the Defendants each expressly agreed that Mr. Buntrock and MedLegal would not be left solely responsible and liable for paying off the debt owed to Legalist simply because he was the only one who was being required to provide a performance guarantee.

139.   Mr. Buntrock agreed to sign the Legalist agreement that included personal performance guarantee based, in part, on the Defendants' verbal agreements that they remained obligated, responsible, and liable for the debts at issue, and their related assurances that they would pay off the debt.  But for the Defendants agreements in that regard, Mr. Buntrock would not have signed off on the Legalist facility and would not have signed the related performance guarantee.

140.   Defendants' agreement with Mr. Buntrock regarding their personal obligations and liability for the debt became a valid and binding contract upon upon Mr. Buntrock's signing of the Legalist agreement and personal performance guarantee.

141.   Defendants received the consideration that they bargained for with Mr. Buntrock, namely: (1) Mr. Buntrock signed of the Legalist agreement and personal guarantee; and (2) as a result, Legalist provided the funding that was used to pay the Bankwell debt, which (a) eliminated their personal liability for that loan and that of the businesses in which they held an ownership interest, and (b) led to the dismissal of the Bankwell lawsuit.

142.   If Mr. Buntrock had not signed off on the Legalist line of credit and the related performance guarantee, Bankwell would have inevitably obtained a judgment against all Defendants and almost certainly would have encumbered their assets, including the assets of MedLegal that were leveraged in order to obtain the Legalist line of credit.  Moreover, Bankwell

would have had the ability to further encumber whatever assets in which Dr. Jacobson still held an interest, pursuant to his personal guarantee of the Bankwell line.

143.     Since the Legalist deal closed, Defendants have repeatedly acknowledged, verbally and in emails, that they are personally liable to Mr. Buntrock and MedLegal for the debts associated with the Bankwell loan, and the corresponding debts now owed to Legalist.  Indeed, their efforts to find cheaper capital to replace the Legalist debt have continued until almost this very day.  Over the last 12 months, Dr. Jacobson, Mr. Capp and Mr. Jacobson have shopped the MedLegal portfolio to a number of other potential lenders.  In some cases, they did so without Mr. Buntrock's knowledge or involvement, even though they are no longer partners in MedLegal.

144.     In violation of their verbal contract with Mr. Buntrock, Defendants have refused to pay the debt owed.  Indeed, Defendants have refused to pay anything towards the debt.

145.     Further, as described herein, Defendants continued to conceal the true extent of their unrelated debts, which have prevented them from paying off or even paying down the debts they owe relating to the Legalist loan and the underlying Bankwell Loan.  As a result of Defendants' concealment, Mr. Buntrock did not know that Defendants would be unable to repay the debt and that they would end up breaching the agreement for many months after the Legalist contract was finalized.

146.     After uncovering the Defendants' misrepresentations and (what appeared to be) the full extent of their other debts, Mr. Buntrock demanded that the individual Defendants repay the debt owed to Plaintiffs.

147.     The Defendants refused to pay the amounts owed, but continued to acknowledge that they owed the money at issue, while providing assurances that they were going to soon be able to start paying down the debts.  The Defendants' representations regarding their ability to pay off

33

the debts were false, and they knew that they were false. The Defendants made the representations in order to induce Mr. Buntrock to hold off on filing suit against them. For a time, Mr. Buntrock obliged, and agreed to give the Defendants additional time.

148. The Defendants have still not repaid the debts owed to the Plaintiffs.

149. Because the Legalist loan carries a high interest rate, the amount owed to Legalist has greatly increased since the parties drew on the line of credit nearly three years ago.

150. Despite their prior agreements, Defendants have recently claimed that they are not liable for the interest that has continued to accrue (while acknowledging, as they must, that they remain responsible for the underlying debt).

151. Defendants breached the verbal agreement by refusing to pay the amounts owed and by announcing their intention not to perform in accordance with their representations and agreements.

152. Mr. Buntrock and MedLegal have been harmed by the Defendants' breaches of the verbal agreement with Mr. Buntrock.

153. Defendants are liable to Mr. Buntrock and MedLegal for the full amount of the balance owed to Legalist based upon their breach of the referenced verbal agreement.

**COUNT II:**
**BREACH OF IMPLIED CONTRACT – ALL DEFENDANTS**
**Implied Contract Relating to the Legalist Funding**

154. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

155. In the event that the trier of fact determines that the Defendants' verbal assurances and agreements were insufficient to form a legal and biding contract under applicable law, Mr. Buntrock alleges in the alternative that an implied contract was created between Defendants and

34

Mr. Buntrock when Defendants repeatedly assured Mr. Buntrock that they would engage in certain actions that would enable the parties' businesses to recover financially, including obtaining and providing funding to pay off the debt to Legalist, in exchange for Mr. Buntrock's commitment to facilitate and personally guarantee the agreement with Legalist for the line of credit.

156. As described, Defendants were personally responsible and liable for the underlying debt owed to Bankwell, because they had misappropriated and used the funds for purposes unrelated to the business of MedLegal and MedLogic, as required under the agreement with Bankwell.

157. Defendants, and particularly Dr. Jacobson, repeatedly assured and represented to Mr. Buntrock that they could and would: (1) leverage their own personal assets and interests in order to obtain additional funding to pay down and pay off the debt owed to Legalist as soon as possible; and (2) remain responsible and liable for the debts in question, because the debts were associated with and resulted from their actions in misusing the funds from the Bankwell loan.

158. Defendants made the referenced assurances and representations in order to induce Mr. Buntrock to sign the agreement with Legalist for the line of credit and to sign the related personal performance guarantee with Legalist.

159. Defendants intended that Mr. Buntrock engage in the referenced actions (*i.e.*, that he sign off on the deal with Legalist), based upon their assurances and representations, as described. Mr. Buntrock, based upon and in reliance upon Defendants assurances and representations, did, in fact, expose himself and MedLegal to further liability, and personally guaranteed the line of credit in order to facilitate that transaction.

160. The referenced assurances and representations by Defendants and the resulting actions by Mr. Buntrock constituted an implied contract between Defendants and Mr. Buntrock.

161.     Defendants accepted and received the benefits of Mr. Buntrock's actions, which enabled Defendants to avoid personal liability to Bankwell, Mr. Buntrock, and potentially others, associated with their misappropriation and improper use of the funds from Bankwell; eliminate liability of companies they owned to Bankwell; end the pending lawsuit filed by Bankwell; and continue operating their businesses.  Defendants received those benefits as a direct result of Mr. Buntrock's actions, as described in this Count.

162.     Defendants breached their implied contract with Mr. Buntrock by refusing to pay the balance owed, by failing and refusing to make any payments to reduce the balance owed since the funds were obtained from Legalist, and by announcing their intention not to pay the debts owed.

163.     It would be inequitable and unjust for Defendants to retain the benefits they received as a result of Mr. Buntrock's financial contributions and commitments, as described herein.

**COUNT III:**
**BREACH OF CONTRACT – MEDLOGIC LLC**
**Breach of Employment Contract**

164.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

165.     Mr. Buntrock was an employee of MedLogic at the time he resigned and gave up his ownership interest in that entity.

166.     Mr. Buntrock's employment was governed by a valid and enforceable employment contract.

167.     Under that contract, Mr. Buntrock was entitled to be paid a salary.  He was owed a salary for the entire time period in which he worked for MedLogic.

36

168.     Defendants failed to pay Mr. Buntrock, as required under his employment agreement, for the time he spent working for the company, and failed to reimburse the expenses he incurred on behalf of the company.

169.     Defendants' failures to pay Mr. Buntrock the amounts in question constituted breaches of his employment agreement with MedLogic.

170.     Mr. Buntrock has been harmed by Defendants' breaches of his employment contract, such that he is entitled to recover damages against Defendants.

171.     As of the date of this filing, Defendants owe $307,857.03 to Mr. Buntrock under his employment agreement, for unpaid salary and unpaid expenses that he incurred on behalf of MedLogic.

## COUNT IV:
## UNJUST ENRICHMENT – ALL DEFENDANTS

172.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

173.     In the event that the trier of fact determines that the Defendants' verbal assurances and agreements were insufficient to form a legal and biding contract under applicable law, and also determines that there was no implied contract between Defendants and Mr. Buntrock, Mr. Buntrock alleges in the alternative that the Defendants were unjustly enriched, based upon the same facts and circumstances.

174.     As described, Defendants were personally responsible and liable for the underlying debt owed to Bankwell, because they had misappropriated and used the funds for purposes unrelated to the business of MedLegal and MedLogic, as required under the agreement with Bankwell.

175.    In signing the Legalist loan and the personal performance guarantee, Mr. Buntrock provided a valuable benefit to Defendants, which allowed Defendants (and Mr. Buntrock) to obtain the Legalist line of credit, which they used to pay off the debt owed to Bankwell and end the Bankwell lawsuit.  Consistent with and pursuant to that personal performance guarantee, Mr. Buntrock has continued to work for and on behalf of MedLegal to monetize the assets that were encumbered.

176.    Mr. Buntrock's actions, particularly his signing of the personal performance guarantee and continuing work for MedLegal, enabled Defendants to avoid personal liability to Bankwell, Mr. Buntrock, and potentially others, associated with their misappropriation and improper use of the funds from Bankwell; eliminate liability of companies they owned to Bankwell; end the pending lawsuit filed by Bankwell; and continue operating their businesses.

177.    MedLegal also provided a valuable benefit to Defendants, because its assets were substantially encumbered via the line of credit with Legliast.

178.    As described herein, Defendants made various assurances and representations in order to induce Mr. Buntrock to sign the Legalist loan and the personal performance guarantee. Most notably, Dr. Jacobson repeatedly made false representations regarding his financial condition.  Defendants also repeatedly assured and represented to Mr. Buntrock that they could and would: (1) leverage their personal assets and interests in order to obtain additional funding to pay down and pay off the debt owed to Legalist as soon as possible; and (2) remain responsible and liable for the debts in question, because the debts were associated with and resulted from their actions in misusing the funds from the Bankwell loan.

38

179.    Defendants accepted and received the benefits of Mr. Buntrock's efforts and actions relating to the Legalist line of credit, and the benefits associated with the encumbrance of MedLegal's assets.

180.    The benefits that Defendants obtained were a direct result of: (1) Mr. Buntrock's personal performance guarantee and his ongoing work for and on behalf of MedLegal, and (2) the encumbrance of MedLegal's assets, as security for the agreement with Legalist.

181.    Mr. Buntrock and MedLegal have suffered financial and reputational harm as a direct result of Defendants' misconduct and their failures and refusals to pay the debts they owe. Mr. Buntrock and MedLegal have not been reimbursed for the amounts that were paid on the Defendants' behalf.  Mr. Buntrock also has not compensated for his efforts and actions, as described in this Count, or for his agreement to guarantee the line of credit.

182.    In addition, as described, Defendants, and particularly Dr. Jacobson and Mr. Capp, have received benefits to which they were not entitled through: (1) Mr. Buntrock's personal payments of approximately $27,000 covering Civotek's operating expenses; (2) Mr. Buntrock's ongoing work for businesses owned, in part, by Defendants, including all work for MedLegal and all work that otherwise depended upon Mr. Buntrock's work as a licensed attorney; and (3) MedLegal's payment of a substantial portion of the debt owed by Dr. Jacobson and Mr. Capp to Generous Charitable, Inc. relating to the $65,000 they claimed to have borrowed from that entity.

183.    Defendants had knowledge of and appreciated all of the benefits described in this Count.

184.    Defendants accepted and retained these benefits.

185.    Under these circumstances, it would be inequitable and unjust for Defendants to retain the benefits that Mr. Buntrock and MedLegal provided without paying compensation for the

benefits they received. Further, Defendants should be forced to disgorge any and all profits or other benefits they obtained as a result of the misconduct as described herein.

186.    Defendants have been unjustly enriched at Plaintiffs' expense in an amount to be proven at trial.

### COUNT V:
### FRAUDULENT INDUCEMENT, FRAUDULENT CONCEALMENT, AND FRAUDULENT/INTENTIONAL MISREPRESENTATION – ALL DEFENDANTS

187.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

188.    In connection with the Defendants' efforts to induce Mr. Buntrock to sign off on the Legalist line of credit and the related personal guarantee, the Defendants knowingly and intentionally made material misrepresentations and/or omissions to Mr. Buntrock.

189.    Specifically, Dr. Jacobson and Mr. Capp knew that Dr. Jacobson's financial condition and the financial condition of the businesses for which they were responsible was far worse than Mr. Buntrock was led to believe.  The Defendants knew about substantial, additional debts totaling millions of dollars that they did not disclose to Mr. Buntrock.  Defendants all knew about the debts because they had arranged for them to be incurred and had benefited from the funds that they received.  Virtually every one of the assets owned by Dr. Jacobson and Mr. Capp was highly leveraged by the end of 2022, and demands had already been made by some of the parties to whom the debts were owed.

190.    None of that information was disclosed to Mr. Buntrock.  When the shocking revelations relating to the Defendants' misappropriation of the funds from the Bankwell loan were finally revealed to Mr. Buntrock, the Defendants minimized their misconduct and hid from view the full scope of their deceit and their financial problems.

40

191.    Instead, Defendants repeatedly represented to Mr. Buntrock that the Legalist loan would enable them to move forward and continue growing the businesses, without ever mentioning that the Bankwell debt was only the tip of the iceberg.  In those discussions, Dr. Jacobson, in particular, falsely represented, repeatedly, that he still had substantial financial assets that were more than sufficient to provide security for his partners and for the businesses.

192.    Defendants also knew that their agreement with Legalist would put Mr. Buntrock in a terrible financial and professional position, due to the personal guarantee and their apparent inability to pay any significant portion of the debt associated with the Bankwell loan.

193.    Defendants withholding of information regarding the additional debts and financial problems, as described in this Count, was done willfully and fraudulently, and constituted fraudulent concealment under Tennessee law.

194.    Defendants repeated affirmative misrepresentations regarding their financial condition, particularly those made by Dr. Jacobson, were made knowingly and fraudulently. Defendants knew their representations were false when they made them.

195.    Defendants knew and intended that Mr. Buntrock would rely upon their fraudulent concealment and fraudulent misrepresentations, as described herein.

196.    Despite the obvious risk to Mr. Buntrock, personally, and the harm that would almost certainly result from their conduct, Defendants purposefully made the false assurances and concealed information regarding the debts that were owed, as described in this Count, in order to induce Mr. Buntrock to sign off on the Legalist agreement and the personal guarantee.

197.    Mr. Buntrock did, in fact, upon the Defendants assurances, described herein, regarding their willingness, intent, and ability to pay off the debt associated with the Bankwell loan, both before and after the deal with Legalist was finalized.  Mr. Buntrock also relied upon his

41

(now apparent) misunderstanding regarding the severity of the financial troubles the Defendants were facing throughout the relevant time period and, in particular, at the time Mr. Buntrock agreed to sign off on the Legalist deal and provide a personal performance guarantee. He also relied upon their fraudulent misrepresentations regarding their financial condition and financial prospects when he agreed to give the Defendants additional time to pay off their debts before filing this lawsuit.

198.    But for the Defendants' fraudulent misrepresentations and fraudulent concealment of information, as described in this Count, Mr. Buntrock would not have signed the Legalist agreement; would not have signed the personal guarantee; would not have agreed to continue working with the Defendants to try to save the businesses; and would not have agreed to further leverage and encumber the assets of MedLegal.

199.    Mr. Buntrock was harmed and suffered damages as a result of the Defendants' fraudulent inducement, fraudulent misrepresentations, and fraudulent concealment of information, in an amount to be proven at trial.

200.    Defendants' conduct, as described in this Count, was willful, intentional, and fraudulent, entitling Mr. Buntrock to an award of punitive damages.

## COUNT VI:
## NEGLIGENT/RECKLESS MISREPRESENTATION – ALL DEFENDANTS

201.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

202.    In the alternative, to the extent that the trier of fact determines that the misrepresentations made by the Defendants that are described in this Complaint were not made fraudulently and/or intentionally, Mr. Buntrock hereby alleges that such misrepresentations were made recklessly and/or negligently.

42

203.     As set forth in this Complaint, Defendants made numerous false statements and omissions that Mr. Buntrock relied upon to his detriment over a period of more than a year regarding the finances of the businesses that they were managing, the financial conditions of the companies, and their own personal financial situations and conditions.

204.     For example, in connection with Mr. Buntrock's signing of the Legalist agreement and the related personal guarantee, Dr. Jacobson falsely represented, repeatedly, that he still had substantial financial assets that were more than sufficient to provide security for his partners and for the businesses.

205.     Starting in late 2022 and continuing through August 2023, Defendants also made numerous material misrepresentations regarding the financial condition of the various businesses they were managing and regarding the financial condition of those companies.  Most notably, Defendants repeatedly misrepresented to Mr. Buntrock the nature and extent of the debt owed to Mr. Pfeffer, his demand for payment and the basis for that demand, and misled Mr. Buntrock into believing that the matter had been or would be resolved when, in fact, they had already been sued.

206.     Defendants recklessly and/or negligently made the referenced representations regarding the condition of the businesses, and regarding their ability to rely upon Dr. Jacobson's assets and wealth to keep the businesses operating.

207.     Defendants knew or should have known that the referenced misrepresentations were false when made.

208.     Mr. Buntrock reasonably and justifiably relied on all of the referenced misrepresentations and omissions made by Defendants in deciding to sign the Legalist agreement and in signing the related personal performance guarantee.  Mr. Buntrock also reasonably and justifiably relied on all of the referenced misrepresentations and omissions made by Defendants

over the course of many months as he agreed to continue working in a partnership with the Defendants and as an employee of MedLogic.

209.    Mr. Buntrock would not have made any of the referenced decisions but for Defendants' material misrepresentations.

210.    Mr. Buntrock has personally suffered and continues to suffer financial and reputational harm as a result of his agreement with Legalist, his personally guarantee relating to the agreement with Legalist, and his continued association with the Defendants and their financial troubles and their related failures to honor their contracts with business associates, investors, and employees.

211.    Defendants have benefitted as a direct result of these financial harms, because they have continuously benefited from the payoff of the Bankwell loan and from Mr. Buntrock's continued work on behalf of the partnership and the parties' businesses.

212.     Mr. Buntrock is entitled to an award of compensatory damages based upon the Defendants' misrepresentations in an amount to be determined at trial.

213.    Defendants' misrepresentations were made with a reckless disregard for the truth, thereby entitling Mr. Buntrock to an award of punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ross Buntrock and MedLegal LLP respectfully demand:

1.    That proper process be issued and served upon the Defendants and that they be required to appear and answer this Complaint within the time prescribed by law;

2.    That Mr. Buntrock be awarded a judgment against the Defendants in an amount sufficient to compensate him for the damages he has suffered;

44

3.      That Mr. Buntrock be granted all other available remedies in equity, including disgorgement of the amount by which Defendants have been unjustly enriched;

4.      That Mr. Buntrock also be awarded a judgment against the Defendants for punitive damages in an amount sufficient to punish the Defendants for their misconduct and to deter the Defendants and others from similar misconduct in the future;

5.      That Mr. Buntrock also be awarded a judgment against the Defendants for exemplary damages in an amount sufficient to compensate him for the humiliation, outrage, and indignity and reputational damage resulting from Defendants' malicious, willful, and wanton misconduct;

6.      That Mr. Buntrock be awarded pre-judgment and post-judgment interest on the damages he has suffered at the highest lawful rates;

7.      That the costs of this action be awarded to Mr. Buntrock;

8.      That Mr. Buntrock be awarded such alternative and/or additional relief as the equities and justice may require; and

9.      That a jury be empaneled to try this cause.


Dated: December 8, 2025

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

By:     _/s/ J. Isaac Sanders_
        J. Isaac Sanders, # 029372
1222 Demonbreun Street, Suite 1201
Nashville, TN 37203
(629) 321-1816 – Telephone
(202) 261-0016 – Facsimile
Isaac.Sanders@wbd-us.com
_Counsel for Plaintiffs_